UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
LAFAYETTE DIVISION

| | | |
|---|---|---|
| TIMOTHY J. COLLINS, III, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Case No. 4:09 cv 12 |
| | ) | |
| PURDUE UNIVERSITY; BOARD OF | ) | |
| TRUSTEES OF PURDUE UNIVERSITY; | ) | |
| PURDUE UNIVERSITY POLICE | ) | |
| DEPARTMENT; STEPHEN J. AKERS; | ) | |
| LYMAN (TREA) R. MITTEN, III; | ) | |
| JEANNE V. NORBERG; ALICE M. | ) | |
| D'AMORE; JANE DOES, Unknown | ) | |
| Purdue Employees; JOHN DOES, | ) | |
| Unknown Purdue Employees; GARY | ) | |
| K. EVANS; JOHN K. COX; CARRIE | ) | |
| K. COSTELLO; FRED V. DAVIS, | ) | |
| MATTHEW C. WIETBROCK; JANE DOES,) | | |
| Unknown Officers and/or | ) | |
| Supervisors; JOHN DOES, Unknown | ) | |
| Officers and/or Supervisors; | ) | |
| WILL RINEHART; JANE DOES, | ) | |
| Unknown Bloggers; JOHN DOES, | ) | |
| Unknown Bloggers; FEDERATED | ) | |
| PUBLICATIONS, INC., | ) | |
| | ) | |
| Defendants | ) | |

<u>OPINION AND ORDER</u>

This matter is before the court on the Motion for Judgment on the Pleadings on Claims Arising Before February 9, 2007 [DE 44]; the Motion for Judgment on the Pleadings on Counts XVI-XVII (Emotional Distress Claims) [DE 46]; the Motion for Judgment on the Pleadings on Counts VII-IX (Defamation/False Light Claims Relating to the Article) [DE 48]; the Motion for Judgment on the Pleadings on All Claims Relating to Third-Party Content [DE 50];

and the Motion Under Indiana's Anti-SLAPP Statute (Treated as a Motion for Summary Judgment) [DE 52], all filed by the defendant, Federated Publications, Inc., on August 26, 2009.  For the reasons set forth below, the Motion for Judgment on the Pleadings on Claims Arising Before February 9, 2007 [DE 44] is **GRANTED**, the Motion for Judgment on the Pleadings on Counts XVI-XVII (Emotional Distress Claims) [DE 46] is **GRANTED**, the Motion for Judgment on the Pleadings on Counts VII-IX (Defamation/False Light Claims Relating to the Article) [DE 48] is **GRANTED**, the Motion for Judgment on the Pleadings on All Claims Relating to Third-Party Content [DE 50] is **GRANTED**, and the Motion Under Indiana's Anti-SLAPP Statute (Treated as a Motion for Summary Judgment) [DE 52] is **DENIED AS MOOT.**

## Background

The facts regarding this matter shall be limited to those well-pleaded factual allegations contained in the plaintiff's First Amended Complaint in order to conform to the applicable standard for a motion to dismiss.  As such, all of the well-pleaded factual allegations are accepted as true, and all reasonable inferences are made in favor of the plaintiff.

Timothy J. Collins, III, was a student at Purdue University at the time of the events precipitating this cause of action. Federated Publications, Inc., owns, operates, and publishes a daily newspaper in Lafayette, Indiana, dubbed the Journal & Courier.  On January 13, 2007, Collins was assaulted on the West Lafayette Campus and suffered injuries as a result of that

2

attack.  Collins sought treatment for the injuries sustained in the attack at the Purdue Student Health Center, which referred Collins to a local hospital.  At the urging of the hospital staff, Collins reported the assault to an officer from the Purdue University Police Department dispatched to the hospital Emergency Room for that purpose.  That same evening, the officer transported Collins to the police headquarters to obtain a written statement from Collins and to prepare a composite picture of Collins' assailants.

On January 16, 2007, three days after Collins' statement reporting the assault, Wade Steffey, another Purdue student, was reported missing after having last been seen on January 12, 2007.[1]  The search for Steffey commenced on that day and ceased on March 22, 2007, when Steffey's body was discovered in a utility closet in the same building where he had been last seen.  During the time period between Steffey's reported disappearance and the discovery of his body, the police were under enormous pressure to find Steffey.  Also during this time, Federated's paper reported on the subject of Steffey's disappearance.

Sometime around January 19, 2007, Collins again was questioned by the police.  Approximately three days later on January 22, 2007, the police officer and an FBI Special Agent assigned to investigate Steffey's disappearance entered Collins' residence

---

[1]Steffey was seen late on January 12, and Collins was assaulted in the early morning hours of January 13.  Both events occurred the same "night" as the term is commonly used.

3

while he was asleep and trying to recover from his injuries,
which included insomnia.  The officer and the FBI agent woke
Collins, took him to the scene of his assault, then brought him
back to the station for further questioning, all without advising
Collins that he was being questioned as a suspect in Steffey's
disappearance.  Two days later, the police gave Collins a poly-
graph test.  On February 5, 2007, the police initiated criminal
charges of False Informing, a Class A misdemeanor, in the Tippe-
canoe County Superior Court.  These charges were filed based on
the results of the polygraph.

On February 10, 2007, Federated published the following
article headlined *Student Who Reported Mugging Charged*, about the
charges pending against Collins:

> A Purdue University student who told police
> he was mugged on campus by three strangers
> the same night Wade Steffey disappeared has
> been charged with misdemeanor false inform-
> ing.  Timothy J. Collins III, 19, who lives
> in Owen Residence Hall, was charged this week
> . . . .  According to the charging informa-
> tion, the false statement "hindered any law
> enforcement process or resulted in harm to an
> innocent person" . . . .  According to sup-
> porting documents, Collins submitted to a
> police polygraph examination Jan. 24 regard-
> ing the alleged attack.  The results of the
> polygraph "suggested deception," according to
> a police report.  At least eight police offi-
> cers for three departments were involved in
> the investigation.

This article also was published online at the Journal & Courier's
website, which allows the readers to post comments about the
article.  The readers' posts to this article were vitriolic and

4

hateful, and anyone visiting that site also was privy to the

content of these readers' posts:

> It would not surprise me in theleast [sic] to
> find out that this Collins kid knows exactly
> what happened to Wade Steffey.  He probably
> got the laceration from Wade trying to pro-
> tect himself.

> \* \* \*

> I hate to say I TOLD YOU SO--but I told you
> so!!  I had said that someone KNOWS what
> happened to Wade and that it wouldn't sur-
> prise me in the lest [sic] bit IF that "some-
> one" didn't deliberately try to mislead the
> investigation and throw LE off of the real
> trail, [sic] by giving false information.  I
> must say however, that I AM surprised that it
> was someone who claimed to have been attacked
> by that same night--but then again I think
> this assine [sic] piece of trash felt he had
> no choice but to do that, so as to throw
> suspicion OFF of him, as to WHY he was sport-
> ing a wound to his head - incurred apparently
> the SAME night Wade siappeared [sic].  I say
> put the squeeze on this trash and make him
> sing--it wouldn't surprise me IF HIS "attack"
> isn't the exact way things went down for poor
> Wade--a brick.  Sick, sick individual who
> would make up such a story and NOT know some-
> thing about the actual truth of a crime.
> This guy needs everything from his underwear
> to his home-away-from-home investigated and
> checked for ANY trace evidence against him
> where WADE is concerned--Purdue DO NOT screw
> this up now.  He LIED for a reason and I
> don't think it was for attention--LE needs to
> stick to his a** like bees on honey.  Sickens
> me.  CIB.

> \* \* \*

> CIB, I went back to read some of this kid's
> lie.  I find it awfully coincidental that his
> version mentions that he lives in Owen and he
> was attacked outside Cary - and I believe
> both of those buildings were mentioned in the
> Steffey story.  Just thought it odd.  Who

knows, but you are right, definitely worth
shaking the crap out of the idiot.

The posting of these readers' comments fueled the suspicious,
charged atmosphere on campus at that time and inflamed the
frenzied efforts to unravel the Steffey mystery.

This charged atmosphere is evidenced by the series of
Facebook messages that were published in the interim between
Collins' January 13 assault and the February 10 publication of
the article.  The blog entries related in the First Amended
Complaint are attributable to defendant Will Rinehart, a Texas
A&M University student, defendant Jeanne V. Norberg, Purdue
University Spokesperson and Director of the University News
Service, and defendant Alice M. D'Amore, an Instructor at Purdue
University.  According to Collins' First Amended Complaint, the
entries include the following:

> On or about Saturday, January 20, 2007, at
> approximately 7:03 p.m., Defendant Rinehart
> posted to Facebook that "it's possible that
> the so-called victim [Collins] is lying
> through his teeth about what happened that
> night."
>
> On or about Sunday, January 21, 2007, at
> approximately 9:56 p.m., defendant Rinehart
> posted to Facebook that he had created a blog
> of "his speculation" at wadesteffey.blogspot.com
> and continued that "[w]hile my hunches may
> very well be incorrect, yesterday I emailed
> that ideas [sic] to the Purdue police depart-
> ment. Today I received a response: 'I can
> only say that I like the way you are think-
> ing.'"
>
> On or about Saturday, January 27, 2007, at
> approximately 9:09 a.m., Defendant Norberg
> replied to Rinehart's Facebook posts and
> wrote, "[i]n the second report alleged victim

6

said he was hit by someone 5'7" with what felt like a brick at 11:30 p.m. . . . Police have been investigating this case very carefully.  They have talked to the person who allegedly was attacked and his friends extensively. On Friday, we issued a report on their behalf that provides an update . . . if you want to share it with others, here is the URL."

On or about Monday, January 29, 2007, at approximately 7:09 a.m., Defendant Rinehart posted to Facebook that "I have messaged Jeanne Norberg, Purdue Spokesperson and Director of Purdue News. She sent me a message on Facebook . . . I have asked her for any new updates . . ."

On or about Monday, January 29, 2007, Defendant Rinehart replied to Defendant Norberg's Facebook post that "This made the bells in my head go 'ding ding ding' considering the possible scenarios I had come up with if the cases were related. I had been writing another reporter from another paper in town about those issues since I wrote the email to the police . . ."

On or about Saturday, February 10, 2007, at approximately 6:59 a.m., Defendant D'Amore posted to Facebook that "he may have reported when police asked how he received the injury on his forhead [sic] to cover his ass."

On or about Saturday, February 10, 2007, at about 4:21 p.m., defendant Rinehart posted to Facebook that ". . . it definitely makes him look suspicious . . . I hope he confesses very soon for the sake of Wade Steffey family and friends."

On or about Saturday, February 10, 2007, at about 7:58 p.m., defendant D'Amore posted to Facebook that ". . . he would want to protect himself because sometimes silence works (see: aruba)."

On or about Saturday, February 10, 2007, at about 8:01 p.m., defendant Rinehart posted to Facebook that "[y]es my gut is telling me that this guy has something to do with it.

guilty. guilty. guilty. I wish he would con-
fess."

On or about Monday, February 12, 2007, at
about 9:04 p.m., defendant D'Amore posted to
Facebook that "No one is condoning a 'lynch
mob.' Mr. Collins lied about being 'attacked'
by three men on the same night Wade Steffey
disappeared. Three stations were involved in
the charge against Collins. This isn't some-
thing being taken lightly. No one is a con-
spiracy theorist; the police do not yet have
Wade, so waging a credible offense is going
to be difficult, but that's what they're
doing at present . . . I in no way meant to
'incite the masses' by posting the article.
But traditionally, there have been reasons
people fabricated testimonies of being 'at-
tacked' by others."

## Discussion

Federal Rule of Civil Procedure 12(c) motions for judgment
on the pleadings "employ[] the same standard that applies when
reviewing a motion to dismiss for failure to state a claim under
Rule 12(b)(6)." ***Buchanan-Moore v. County of Milwaukee***, 570 F.3d
824, 827 (7th Cir. 2009)(*citing **Pisciotta v. Old Nat. Bancorp**,
499 F.3d 629, 633 (7th Cir. 2007)). Federal Rule of Civil Proce-
dure 12(b)(6) allows for a complaint to be dismissed if it fails
to "state a claim upon which relief can be granted." Allegations
other than those of fraud and mistake are governed by the plead-
ing standard outlined in Federal Rule of Civil Procedure 8(a),
which requires a "short and plain statement" to show that a
pleader is entitled to relief. The Supreme Court clarified its
interpretation of the Rule 8(a)(2) pleading standard in a deci-
sion issued in May 2009. While Rule 8(a)(2) does not require the
pleading of detailed allegations, it nevertheless demands some-

8

thing more "than an un-adorned, the-defendant-unlawfully-harmed-me accusation." ***Ashcroft v. Iqbal***, ___ U.S. ___, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009).  In order to survive a Rule 12(b)(6) motion, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  ***Iqbal***, 129 S.Ct. at 1949 (*quoting **Bell Atlantic Corp. v. Twombly***, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).  This pleading standard applies to all civil matters.  ***Iqbal***, 129 S.Ct. at 1953.

The decision in ***Iqbal*** discussed two principles that under-scored the Rule 8(a)(2) pleading standard announced by ***Twombly***.  *See **Twombly**,* 550 U.S. at 555 (discussing Rule 8(a)(2)'s require-ment that factual allegations in a complaint must "raise a right to relief above the speculative level").  First, a court must accept as true only *factual* allegations pled in a complaint; "[t]hreadbare recitals of the elements of a cause of action" that amount to "legal conclusions" are insufficient.  ***Iqbal***, 129 S.Ct. at 1949.  Next, only complaints that state "plausible" claims for relief will survive a motion to dismiss:  if the pleaded facts do not permit the inference of more than a "mere possibility of mis-conduct," then the complaint has not met the pleading standard outlined in Rule 8(a)(2).  ***Iqbal***, 129 S.Ct. at 1949-50. *See also **Brown v. JP Morgan Chase Bank***, 2009 WL 1761101, *1 (7th Cir. June 23, 2009)(defining "facially plausible" claim as a set of facts that allows for a reasonable inference of liability).

9

The Supreme Court suggested a two-step process for a court to follow when considering a motion to dismiss.  First, any "well-pleaded factual allegations" should be assumed to be true by the court.  Next, these allegations can be reviewed to determine if they "plausibly" give rise to a claim that would entitle the complainant to relief.  *Iqbal*, 129 S.Ct. at 1949-50.  Reasonable inferences from well-pled facts must be construed in favor of the plaintiff.  *Murphy v. Walker*, 51 F.3d 714, 717 (7th Cir. 1995); *Maxie v. Wal-Mart Store*, 2009 WL 1766686, *2 (N.D. Ind. June 19, 2009)(same); *Banks v. Montgomery*, 2009 WL 1657465, *1 (N.D. Ind. June 11, 2009)(same).

"[A] Rule 12(c) motion is designed to provide a means of disposing of cases when the material facts are not in dispute between the parties and a judgment on the merits can be achieved by focusing on the content of the competing pleadings, exhibits thereto, matters incorporated by reference in the pleadings, whatever is central or integral to the claim for relief or defense, and any facts of which the district court will take judicial notice."  5C Wright & Miller, *Federal Practice and Procedure Civil 3d* §1367, 206-07 (West 2004).  Although employing the standard of review of a motion to dismiss, a motion for judgment on the pleadings results in the final disposition of the case if judgment is entered for the movant.  *See* 5C Wright & Miller, *Federal Practice and Procedure Civil 3d* §1369, 261 (West 2004)("Both the summary judgment procedure and the motion for judgment on the pleadings are concerned with the substance of the

10

parties' claims and defenses and are directed towards a final judgment on the merits."). *See also* **Collins v. Bolton**, 287 F.Supp. 393, 396 (D.C. Ill. 1968)("It is settled that a motion for a judgment on the pleadings is a motion for a judgment on the merits.").

The first of Federated's series of motions for judgment on the pleadings asks that all claims based upon statements made before February 9, 2007, be barred because of the two year statute of limitations and the filing date of Collins' original complaint in this matter, February 9, 2009.  I.C. 34-11-2-4.  The response filed by Collins concedes the point, stating no objection to the motion.  Therefore, this motion to bar all claims based upon statements made before February 9, 2007, is **GRANTED.**

Federated's second motion requests dismissal of Count XVI, Collins' claim for Intentional Infliction of Emotional Distress, and Count XVII, that for Negligent Infliction of Emotional Distress.  Collins' Response brief lacks a single substantive cite regarding the tort claims involved in this motion.  Federated correctly points out in its Reply that Collins "simply shoots from the hip" in his assertion that the publishing of the article - to be precise, the opening sentence of that article - was extreme and outrageous and was done intentionally to harm his psyche.  The court requires some sort of case and fact comparison with which the asserted facts of this case can be measured.  Although Collins neglected to demonstrate that publishing the article, both in print and on the interactive website, is compa-

11

rable to other extreme and outrageous acts found by Indiana courts, this court will examine the leading Indiana cases on these torts.

"Intentional infliction of emotional distress is committed by 'one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another[.]'" **Branham v. Celadon Trucking Services, Inc.**, 744 N.E.2d 514, 522-23 (Ind. App. 2001)(*citing* and *quoting* **Ledbetter v. Ross**, 725 N.E.2d 120, 123-24 (Ind. App. 2000)).  The basis of the tort is the intent to harm emotionally.  **Ledbetter**, 725 N.E.2d at 124. The tort occurs when a defendant (1) engages in extreme and outrageous conduct that (2) intentionally or recklessly (3) causes (4) severe emotional distress to another.  **Branham**, 744 N.E.2d at 523.

Indiana courts regularly quote Section 46 of the Restatement (Second) of Torts in describing the extreme and outrageous conduct required to sustain a cause of action for this tort:

> Extreme and outrageous conduct.  The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous.  It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort.  Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.  Generally, the case is one

> in which the recitation of the facts to an
> average member of the community would arouse
> his resentment against the actor, and lead
> him to exclaim, "Outrageous!"

*Creel v. I.C.E. & Associates, Inc.*, 771 N.E.2d 1276, 1282 (Ind.
App. 2002); *Branham*, 744 N.E.2d at 523; *Bradley v. Hall*, 720
N.E.2d 747, 752-53 (Ind. App. 1999); *Gable v. Curtis*, 673 N.E.2d
805, 809-10 (Ind. App. 1996).  Defining extreme and outrageous
conduct depends upon the prevailing cultural norms and values.
*Bradley*, 720 N.E.2d at 753.  "In the appropriate case, the
question can be decided as a matter of law."  *Dietz v. Finlay
Fine Jewelry Corp.*, 754 N.E.2d 958, 970 (Ind. App. 2001).
*Compare Bradley*, 720 N.E.2d at 752 (finding that a genuine issue
of material fact existed as to whether supervisor engaged in
extreme and outrageous conduct by allegedly shouting at the
employee, criticizing her work in front of other employees,
inquiring about her menopause and whether her husband was sexu-
ally impotent from his diabetes, and misrepresenting the security
of her position of employment) *and Mitchell v. Stevenson*, 677
N.E.2d 551, 563-64 (Ind. App. 1997)(finding that disinterring
deceased's remains, removing headstone, and cremating deceased
against the wishes of deceased and other family members was
extreme and outrageous conduct) *with Lindsey v. DeGroot*, 898
N.E.2d 1251, 1264-65 (Ind. App. 2009)(finding that dairy employ-
ees' alleged nuisance, negligence, trespass, and criminal mis-
chief were not extreme and outrageous conduct); *Lachenman v.
Stice*, 838 N.E.2d 451, 457 (Ind. App. 2005)(finding that failure

13

to control dog which attacked and killed the plaintiff's dog was not extreme and outrageous conduct); *Conwell v. Beatty*, 667 N.E.2d 768, 775-76 (Ind. App. 1996)(finding no outrageous conduct where a sheriff announced a deputy's arrest at a press conference and refused to assist that deputy in completing retirement forms); *and Gable*, 673 N.E.2d at 811 (holding that large number of phone calls lacking obscenity or threatened violence, whether or not justified, was not sufficiently outrageous to state a cause of action).

The most comparable of these cases is *Conwell*, which involved a deputy's arrest on charges of theft after the sheriff held a press conference about the incident.  667 N.E.2d at 772-73.  Sheriff Beatty informed the press that Conwell had been arrested pursuant to warrants for theft and official misconduct. The sheriff also relayed the details of the price switching incident which were presented to the court in support of the arrest and search warrants, and added that Conwell had been involved in a similar incident previously.  Conwell later was acquitted of the charges.  Although the court found a material issue of fact regarding whether Sheriff Beatty intended to cause emotional injury to Conwell, the court held as a matter of law that Beatty's conduct was not extreme and outrageous.  The statements made at the press conference were "true, non-defamatory statements."  *Id.* at 777.  Additionally, the arrest and search warrants were validly executed.  The fact that Beatty was

14

perhaps "more zealous" than necessary did not render his conduct "beyond all possible bounds of decency." *Id.*

Although this matter is similar to *Conwell* in the nature of the conduct in question, a public press disclosure, it is farther from outrageousness because of the degree of separation between the source of information and the outlet.  Like in *Conwell*, Federated accurately reported the criminal charges pending against Collins.  Also like *Conwell,* Collins  subsequently was acquitted of the criminal charges.  Collins, like Conwell, claimed severe emotional distress at the public disclosure of the details of the criminal charges.  The fact content of the article published by Federated – that in the disputed first sentence – is an accurate factual report of what the newspaper was told by the police.

However, Collins contests the accuracy of this sentence, arguing that the semantics of the sentence implied something other than the obvious meaning that most readers would give to it:  that the "Purdue University student (referring to Collins) **who told police he was mugged** on campus by three strangers **the same night Wade Steffey disappeared**" indicated that he had knowledge of Steffey's disappearance at the time and literally "told police" something about Steffey.  Collins contends that this sentence indicated that on January 13, 2007, he mentioned Steffey in some way to the police when he reported his mugging.  This would be potentially incriminating because Steffey was not reported missing until January 16, and his body had not been

15

discovered by the date of this article's publication, February
10, 2007.  Although reporting such a fact would be misleading,
this interpretation of the article's initial sentence is strain-
ed.  If, in fact, Collins stated to the police on January 13,
2007, anything about Steffey's disappearance, Steffey would have
been deemed missing at that time.  Although the sentence struc-
ture allows for this grammatical possibility, it was not its
intended or likely meaning.  Federated's story almost a month
after the fact clearly reported that Collins' assault and the
date of Steffey's last sighting happened to be the same date.
Even applying the lower standard of proof for a motion to dis-
miss, this court accepts all of the factual allegations made by
Collins in his Amended Complaint describing the events of early
2007, but cannot accept that this sentence printed in the Journal
& Courier could state a claim for intentional infliction of emo-
tional distress.  Construing the sentence in the awkward, non-
conventional way that Collins suggests is not reasonable and
cannot be considered as a reasonable inference of the facts
weighing in favor of Collins.  Such a statement reported factu-
ally in a newspaper that regularly reports criminal charges and
police department statements cannot be deemed outrageous.

Similarly, Collins neglects to give case law to support the
element of intent.  The Amended Complaint repeatedly character-
izes Federated's actions as intentional, but this label cannot
support the legal conclusion that Federated committed an inten-
tional tort.  "It is the intent to harm one emotionally that

16

constitutes the basis for the tort of an intentional infliction of emotional distress." *Tucker v. Roman Catholic Diocese of Lafayette-In-Indiana*, 837 N.E.2d 596, 603 (Ind. App. 2005)(*quoting Cullison v. Medley*, 570 N.E.2d 27, 31 (Ind. 1991)).

In *Tucker*, the plaintiff claimed that a church employee molested her as a child and filed her complaint almost 40 years later.  Tucker claimed intentional infliction of emotional distress, but the Diocese's motion to dismiss was granted because she "fail[ed] to allege [ ] that it was the Diocese's intent to emotionally harm Tucker."  837 N.E.2d*.* at 603.

In similar fashion, Collins has failed to state the necessary intent to cause emotional distress here.  Federated's conduct was consistent with the practice of any newspaper reporting local police activities and reporting the details of Steffey's disappearance.  Nothing in Collins' Amended Complaint describes the intent necessary for a personal tort or states a plausible motive for Federated to bring about Collins' distress.  *See, e.g., Lachenman*, 838 N.E.2d at 457 ("[T]here is also nothing in the record which would support a reasonable inference to the effect that the [defendants] intended to cause [the plaintiff] emotional distress by their behavior."); *Watters v. Dinn*, 666 N.E.2d 433, 438 (Ind. App. 1996)(finding a legitimate motive for the alleged intentional acts which "belies [the plaintiff's] assertion that [the defendant] acted with the sole intent to harm him", and therefore affirming the trial court's grant of summary judgment on an intentional infliction of emotional distress

17

claim).  As a result, Collins fails to allege the necessary intent for this tort.

Collins also argues that inviting readers' comments about the article and publishing them on the website constituted the outrageous conduct element necessary for the claim of intentional infliction of emotional distress.  Regardless of any free speech protections and the fact that the scathing commentary was not written by Federated,[2] publishing the article on the site and allowing readers' comments cannot be regarded as outrageous. Even if the readers' comments had been outrageous, Federated's actions in that regard were not outrageous and lack the requisite intent for a claim of intentional infliction of emotional distress.

As for Federated's argument that the basic prerequisites for negligent infliction of emotional distress, namely physical impact or witnessing a tragedy, are not present here, Collins agrees that there is no legal basis for Count XVII's claim for negligent infliction of emotional distress.  Therefore, this motion for judgment on the pleadings for Counts XVI-XVII is **GRANTED** on both Count XVI for Intentional Infliction of Emotional Distress and Count XVII for Negligent Infliction of Emotional Distress.

---

[2]The court takes judicial notice that it is common practice for online articles to include the opportunity for public discussion in the form of postings such as here.

Federated's third motion for judgment on the pleadings asks the court for judgment on the merits for two claims of defamation, Count VII alleging Libel by Innuendo and Count VIII alleging Libel Per Se, and Count IX alleging False Light, all for the content of the February 10, 2007 article.  Federated argues that the statements in the article were not defamatory and that the truthfulness of the article is a complete defense.

Defamation is "that which tends to injure reputation or to diminish esteem, respect, good will, or confidence in the plaintiff, or to excite derogatory feelings or opinions about the plaintiff." *Ratcliff v. Barnes*, 750 N.E.2d 433, 436 (Ind. App. 2001).  To establish defamation, a plaintiff must prove the following elements:  (1) a communication with defamatory imputation; (2) malice; (3) publication; and (4) damages. *Lovings v. Thomas*, 805 N.E.2d 442, 447 (Ind. App. 2004)(*citing Ratcliff*, 750 N.E.2d at 436).  "The determination of whether a communication is defamatory is generally a question of law for the court." *Lovings*, 805 N.E.2d at 447.  However, if the communication is reasonably susceptible to either defamatory or non-defamatory interpretation, that determination becomes a question of fact for the jury. *Id*. *See also West v. Wadlington*, 908 N.E.2d 1157, 1167 (Ind. App. 2009)(holding that a trier of fact reasonably could infer that statement about the plaintiff "attack[ing]" the pastor and his family could have imputed a physical attack and, therefore, criminal conduct); *Glasscock v. Corliss*, 823 N.E.2d 748, 753 (Ind. App. 2005)(*citing Lovings* and stating same); *Cochran v.*

19

*Indianapolis Newspapers, Inc.*, 372 N.E.2d 1211, 1217 (Ind. App. 1978)("In determining whether a defamatory meaning is possible, the test is the effect which the article is fairly calculated to produce and impression it would naturally engender in the mind of the average person.").  Communications are considered defamatory per se when they impute criminal conduct, a loathsome disease, misconduct in a person's trade, profession, office, or occupation, or sexual misconduct to the plaintiff.  *Trail v. Boys and Girls Clubs of Northwest Indiana*, 845 N.E.2d 130, 137 (Ind. 2006).  If the communication in question is defamatory per se, damages are presumed even without proof of actual harm to the plaintiff's reputation.  *Lovings*, 805 N.E.2d at 447.

Whether a communication is defamatory "depends, among other factors, upon the temper of the times [and] the current of contemporary public opinion, with the result that words, harmless in one age, in one community, may be highly damaging to reputation at another time or in a different place."  *Journal-Gazette Co., Inc. v. Bandido's, Inc.*, 712 N.E.2d 446, 451 (Ind. 1999).  In addition, the communication is to be viewed in context and given its plain and natural meaning as to the idea that it intends to convey.  *Grimes v. Union Planters Bank, N.A.*, 2004 WL 2378841, *21 (S.D. Ind. August 30, 2004).  A false statement of fact is required to impose liability for defamation.  *Bandido's*, 712 N.E.2d at 457.  *See also Barlow v. Sipes*, 744 N.E.2d 1, 8 (Ind. App. 2001) ("In order to recover in an action for defamation, that which caused the alleged defamation must be both false and

20

defamatory."). The First Amendment protections ensuring the free interchange of ideas, however, do not require literal truth: "it is sufficient if the statement is substantially true." ***Heeb v. Smith***, 613 N.E.2d 416, 420 (Ind. App. 1993).

To establish a defamation claim, a plaintiff also must prove malice: "The actual malice standard of proof required in defamation cases involving matters of public or general concern applies not only to public figures, but to private individuals as well." ***Shepard v. Schurz Communications, Inc.***, 847 N.E.2d 219, 224 (Ind. App. 2006)(*quoting* and *citing* ***Bandido's***, 712 N.E.2d at 449). Actual malice exists when a defendant publishes a defamatory statement "with knowledge that it was false or with reckless disregard of whether it was false or not." ***Shepard***, 847 N.E.2d at 225 (*citing* and *quoting* ***New York Times Co. v. Sullivan***, 376 U.S. 254, 279-80, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964)).

Initially, the court must determine whether any statement in the article was false, and in doing so, "the allegedly defamatory words are to be construed in light of the circumstances of their utterance." ***Rambo v. Cohen***, 587 N.E.2d 140, 145 (Ind. App. 1992). Collins alleges that the first sentence was false by its structure, which he suggests reported that he "told" the police something about Steffey's disappearance on the night he reported his mugging. Collins also claims that the article's quotations from his charging information that his alleged false statement "hindered the investigation" and "harmed an innocent person" implied that Collins hindered the Steffey investigation and

21

harmed Steffey.  Last, Collins alleges that the article created a
"link" between himself and Steffey - one that exploded in import
due to the charged atmosphere following Steffey's disappearance.

Indiana case law consistently upholds truth as a complete
defense to defamation claims.  In ***Northern Indiana Public Service
Co. v. Debagia***, 721 N.E.2d 294, 301 (Ind. App. 1999), the plain-
tiff alleged defamation over a statement by an officer of the
defendant corporation that "[t]he audit's complete, . . . how-
ever, [the plaintiff] has been let go."  The appellate court
found that at the time the statement was made, the audit appar-
ently was complete, and the plaintiff had been fired.  The case
was reversed and remanded with instructions to enter summary
judgment in favor of the defendant after discussing the lack of
evidence that the statement in question was untrue.

In ***Bandido's***, the plaintiff restaurant sued a local newspa-
per for printing an article headlined:  Health Board Shuts Doors
of Bandido's:  Inspectors find rats, roaches at local eatery.
712 N.E.2d at 450.  The restaurant claimed defamation because the
health board stated that evidence of flies, roaches and rodents
had been found in the restaurant and noted rodent droppings "only
in restroom."  *Id.* at 449.  The Indiana Supreme Court discussed
the truthfulness of the use of the word "rats" in the subheadline
and found that, though the word "rats" was not in the health
board report, that inaccuracy did not create a falsehood.  *Id.* at
461 ("Whatever distinction one might draw between a rat and
rodent, we believe the difference 'fits easily within the breath-

22

ing space that gives life to the First Amendment.'")(*quoting **Bose Corp. v. Consumers Union of U.S., Inc.**, 466 U.S. 485, 513, 104 S.Ct. 1949, 1966, 80 L.Ed. 502 (1984)).

There was no falsity in Federated's publication of the criminal charge of false informing or the quoted portions of the charging information.  Regardless of the sentence structure, the content of the article was true.  Each phrase and sentence relayed truthful facts.  Like in **Debagia**, the accuracy of the communication's facts are undisputed.  Even more so than the rat/rodent distinction from **Bandido's**, the first sentence of the article, the mention that Steffey was last seen on the same night that Collins told police he was assaulted, was true.  The strained meaning that Collins applies to the first sentence is not the impression that the average reader would draw from the article.  Likewise, the quoted material from Collins' charging information was accurate and truthful.

As for the falsity of the article creating a "link" between Collins and Steffey which was reflected in the readers' postings, the First Amended Complaint details the Facebook blogging of Rinehart and Norberg that also "linked" the two before the publication of the article.  The time of Collins' mugging and the last sighting of Steffey corresponded and consequently linked the two men, and that was the sole statement made in the article.  Like the newspaper's use of "rat" rather than "rodent" in **Bandido's**, the "link" of Collins and Steffey was substantially true:  both

were potential crime victims on the same evening.  There was no falsity, and therefore no defamation.

Collins also charges Federated with the tort of false-light invasion of privacy, which is similar to defamation, but has a different reach:  defamation reaches injury to reputation, while privacy actions involve injury to the plaintiff's emotions and mental state.

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if
>
> > (a) the false light in which the other was placed would be highly offensive to a reasonable person, and
> >
> > (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.
>
> *Branham*, 744 N.E.2d at 524 (*quoting* Restatement (Second) of Torts §652E (1977))

In *Branham*, the plaintiff sued for false light invasion of privacy after his co-workers took an odd photograph of him while he was sleeping during a break.  The photo depicted Branham asleep in a chair while his colleague posed with his pants down and a lewd, suggestive hand placement near the snoozing Branham.  His cohorts then showed the picture around the workplace, making Branham feel "like a laughing stock."  The Indiana Court of Appeals found that the picture was a truthful representation of "him asleep with a partially clad co-worker beside him" and,

24

because the photo was accurate and not false, held that the false
light claim failed.  *Id.* at 525.

Like in **Branham**, Collins' claim fails for the same reason
his defamation claim fails:  there was no false light because
there was no false information.  As discussed above, Federated's
publication accurately noted the charges against Collins as
reported by the police, quoted phrases from the charging informa-
tion, and mentioned the fact that Collins reported his mugging on
the same evening that Steffey was last seen.  The article viewed
in context was factually accurate and cannot be the basis for a
false light claim.

Therefore, Federated's third motion for judgment on the
pleadings for Count VII alleging Libel by Innuendo, Count VIII
alleging Libel Per Se, and Count IX alleging False Light is
**GRANTED.**

Federated's fourth motion for judgment on the pleadings
requests judgment on the merits of all counts naming Federated
which are the result of third-party communications, Count X
alleging Libel, Count XI alleging Libel Per Se, and Count XII
alleging False Light.  These three counts blame Federated for the
postings that readers published on the newspaper's website in
response to the article.  Federated asserts that it is shielded
by the Communications Decency Act ("CDA") from any liability for
the third-party postings.  Collins argues that the Act does not
immunize Federated, because Federated is, via its website, an

"information content provider" rather than an "interactive computer service" as defined by the CDA.

The CDA provides for the following treatment of a publisher or speaker: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. §230(c)(1).  The CDA defines "an interactive computer service" ("ICS") as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions."  47 U.S.C. §230(f)(2).  An "information content provider" is defined as "any person or entity that is responsi- ble, in whole or in part, for the creation or development of information provided through the Internet or any other interac- tive computer service."  47 U.S.C. §230(f)(3).

"Near-unanimous case law holds that Section 230(c) affords immunity to ICSs against suits that seek to hold an ICS liable for third-party content." *Chicago Lawyers' Committee For Civil Rights Under The Law, Inc. v. Craigslist, Inc.* ("*Craigslist I*"), 461 F.Supp.2d 681, 688 (N.D. Ill. 2006), *aff'd*, 519 F.3d 666 (7th Cir. 2008).  After hashing out the Congressional intent, courts consistently have held that §230(c)(1) offers broad immunity for ICSs to stimulate robust avenues of speech.  *See Craigslist I*, 461 F.Supp.2d at 690 n.6 (listing the plethora of cases holding

26

for immunity for third-party speech).  In ***Chicago Lawyers'
Committee For Civil Rights Under Law, Inc. v. Craigslist, Inc.***
(*"Craigslist II"*), 519 F.3d 666 (7th Cir. 2008), the Court of
Appeals stated:

> What §230(c)(1) says is that an online infor-
> mation system must not "be treated as the
> publisher or speaker of any information pro-
> vided by" someone else.  Yet only in a capac-
> ity as publisher could [the defendant] be
> liable under [the relevant statute].  [The
> defendant] is not the author of the ads and
> could not be treated as the "speaker" of the
> posters' words, given §230(c)(1).  .  .  .
>
> Section 230(c)(1) is general.  Although the
> impetus for the enactment of §230(c) as a
> whole was a court's opinion holding an infor-
> mation content provider liable, as a pub-
> lisher, because it had exercised some selec-
> tivity with respect to the sexually oriented
> material it would host for customers, a law's
> scope often differs from its genesis.  .  .  .
>
> Congress could have written something like:
> "No provider or user of an interactive com-
> puter service shall be treated as the pub-
> lisher or speaker of any *sexually oriented
> material* provided by another information
> content provider."  That is not, however,
> what it enacted.  Where the phrase "sexually
> oriented material" appears in our rephrasing,
> the actual statute has the word "informa-
> tion."  That covers ads for housing, auctions
> of paintings that may have been stolen by
> Nazis, biting comments about steroids in
> baseball, efforts to verify the truth of
> politicians' promises, and everything else
> that third parties may post on a web site;
> "information" is the stock in trade of online
> service providers. (emphasis in original).
>
> 519 F.3d at 671

Although Collins goes to great lengths in his response to
argue (albeit, without a single supporting case cite) that

Federated is a not an interactive computer service but a content provider, and therefore is not entitled to the CDA immunity, Federated's website, as described in the First Amended Complaint, fits the CDA scheme.  As the internet communities have developed, so has the case law.  Although much of the initial CDA immunity was granted to internet service providers like AOL, Collins incorrectly asserts that the immunity ends with such providers. For example, there are many cases holding that websites are under the umbrella of protection of §230(c)(1).  *See, e.g., Blockowicz v. Williams*, ___ F.Supp.2d ___ , ___, 2009 WL 4929111, *2 (N.D. Ill. Dec. 21, 2009)("The [CDA] limits the ability of an aggrieved party to sue an internet website host for defamatory statements posted on its site by third-parties.  Avoiding these limitations, the Blockowiczs instead sued the authors of the defamatory posts[.]"); *Dart v. Craigslist, Inc.*, 665 F.Supp.2d 961, 969 (N.D. Ill. 2009)(holding website that provided user-created classified services was entitled to immunity under CDA for post-ings of its users); *Global Royalties, Ltd. v. Xcentric Ventures, LLC*, 544 F.Supp.2d 929, 933 (D. Az. 2008)("It is obvious that a website entitled Ripoff Report encourages the publication of defamatory content.  However, there is no authority for the proposition that this makes the website operator responsible, in whole or in part, for the 'creation or development' of every post on the site.").

Web sites frequently are sued for posting third-party com-ments.  *Dimeo v. Max*, 248 F.App'x 280 (3rd Cir. 2007), involved a

28

celebrity suing the proprietor of an internet web site for the publication of an allegedly defamatory statement.  The Third Circuit found Max's website to be an interactive computer service because "it enables computer access by multiple users to a computer server."  *Id.* at 282.  Although Dimeo argued that Max was the "publisher" of the comments posted on his website, the trial court and the Third Circuit agreed that the web host was not "responsible, in whole or in part, for the creation or development of information" that was posted by others.  *Id.*  Even though Dimeo argued on appeal that the website "solicited and encouraged members of his message board community to engage in defamatory conduct or was otherwise partially responsible for the conduct," the Court of Appeals found no facts in the complaint which supported such an allegation.  *Id.*

Similarly, in **Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.**, 591 F.3d 250 (4th Cir. 2009), a group of franchised automotive dealers brought an action against the owner of a consumer review website alleging defamation.  The dealers alleged that website operator employees contacted consumers to ask questions about their complaints and to help them draft or revise their complaints, thereby developing or creating some of the posted content.  However, the Fourth Circuit found the dealers' claims of revising or redrafting the content to be "both threadbare and conclusory."  *Id.*  Rather, to escape the §230 immunity, the plaintiff was "required to plead facts to show any alleged drafting or revision by Consumeraffairs.com was something more than a

website operator performs as part of its traditional editorial function." *Id. Cf. Whitney Information Network, Inc. v. Xcentric Ventures, LLC*, 199 F.App'x 738 (11th Cir. 2006)(remanding on jurisdictional issue when unable to determine factually whether plaintiff's allegations of website tailoring postings of complaints and adding words such as "ripoff," "dishonest," or "scam" resulted in editorial control over content of postings).

Comparing those cases to this matter, Federated can be held liable for defamatory statements in its own material published on the website – such as the article *if* the article was defamatory – but cannot be held liable for the publication of remarks or postings by third parties.  Like the defendant in *Dimeo*, Federated did not create or develop the posted comments and cannot be held responsible for them.  Also like *Dimeo*, none of the facts before the court show any encouragement by Federated for readers to comment on the website articles in a defamatory way.  Moreover, Collins has made no assertions in either his First Amended Complaint or his response briefs suggesting that Federated engaged in any of the revisions or redrafting discussed in *Nemet* or applied any editorial function whatsoever over the comments posted by the readers on its website.  Collins himself titles these counts in his First Amended Complaint as "reader comments," making them unattributable to Federated.  Because Federated is immune from liability for the third-party content posted on its website by the CDA, Collins' claims charging Federated with liability for the third-party postings on its website fail.

30

Collins has cited just one case in his brief in opposition
to CDA relief for Federated, *Craigslist II*, 519 F.3d 666. Collins
proposes in his final argument that *Craigslist II* supports
liability for causation when a website induces the post of a
particular listing.  Then, in a single, unsupported sentence,
concludes that Federated caused the reader postings and is not
protected by the CDA.  There are two major flaws to this argu-
ment.  First, the quoted passage from *Craigslist* does not in any
way support the notion that Federated caused the reader posts.
That portion of Chief Judge Frank Easterbrook's opinion when
viewed in context and in its entirety makes the opposite point
than what Collins proffers:

> Online services are in some respects like the
> classified pages of newspapers, but in others
> they operate like common carriers such as
> telephone services, which are unaffected by
> [the Fair Housing Act's non-discriminatory ad
> statute] because they neither make nor pub-
> lish any discriminatory advertisement, text
> message, or conversation that may pass over
> their networks.  Ditto courier services such
> as FedEx and UPS, which do not read the docu-
> ments inside packages and do not make or
> publish any of the customers' material.  Web
> sites are not common carriers, but screening,
> though lawful, is hard.  .  .  .
>
>                    *  *  *
>
> Almost in passing, the Lawyers' Committee
> insists that craigslist can be liable as one
> who "cause[d] to be made, printed, or pub-
> lished any [discriminatory] notice, state-
> ment, or advertisement".  Doubtless craigs-
> list plays a causal role in the sense that no
> one could post a discriminatory ad if craigs-
> list did not offer a forum.  That is not,
> however, a useful definition of cause.  One
> might as well say that people who save money

"cause" bank robbery, because if there were
no banks there could be no bank robberies.
An interactive computer service "causes"
postings only in the sense of providing a
place where people can post.  Causation in a
statute such as [the Fair Housing Act's non-
discrimination statute] must refer to causing
a particular statement to be made, or perhaps
the discriminatory content of a statement.
That's the sense in which a non-publisher can
cause a discriminatory ad, while one who
causes the forbidden content may not be a
publisher.  Nothing in the service craigslist
offers induces anyone to post any particular
listing or express a preference for discrimi-
nation;  for example, craigslist does not
offer a lower price to people who include
discriminatory statements in their postings.
If craigslist "causes" the discriminatory
notices, then so do phone companies and cou-
rier services (and, for that matter, the
firms that make the computers and software
that owners use to post their notices on-
line), yet no one could think that Microsoft
and Dell are liable for "causing" discrimina-
tory advertisements.

*Craigslist*, 519 F.3d at 668, 671-72

The Chief Judge clearly stated that causation cannot be attrib-

uted to the online forum which provided the opportunity for

third-parties to post comments.  Although *Craigslist* concerns the

Fair Housing Act, the implication for the website is clear:  if

the website does not influence the content of the posts in any

way, there can be no liability attached.  Second, Collins'

conclusion that Federated caused the comments is offered without

a scintilla of factual support.

Here, by all accounts, Federated did nothing to induce any

readers to post a commentary on the article nor to express a

preference for a particular viewpoint in the posts.  Nowhere in

32

Collins' Amended Complaint is the assertion that Federated chose the particularly hateful and denigrating posts over a batch of kinder, gentler comments.  Nor does Collins suggest that any of Federated's staff writers or editors were responsible for the particular posts or their content.  To the contrary, Collins has identified these posts on the website as "reader comments" or "reader posts", and taking Collins at his word, Federated cannot be liable for the statements made by these third-parties.

Therefore, this motion for judgment on the pleadings on all claims relating to third-party content, Count X alleging Libel, Count XI alleging Libel Per Se, and Count XII alleging False Light, is **GRANTED.**

Collins asks the court in each of his responses to this series of motions for judgment on the pleadings for the opportunity to amend his Amended Complaint.  However, the incontrovertible facts of this matter are not amenable to amendment.  Amending his pleading cannot change the text of the article in question published by Federated, cannot raise the behavior of Federated to that which could be called "Outrageous!" or personally intentional, cannot make the newspaper report less true, and cannot make the comments posted by readers on Federated's website attributable to Federated.  In short, the established material facts are not subject to redemption by amendment, so amendment to the complaint would be futile.  *See Sigsworth v. City of Aurora, Ill.*, 487 F.3d 506, 512 (7th Cir. 2007)(*citing Helm v. Resolution Trust Corp.*, 84 F.3d 874, 879 (7th Cir. 1996)(denying motion to

amend when the amendment is doomed).  All grants of judgment on the pleadings here are to be entered as final judgments on the merits.  *See **Carr v. Tillery***, 591 F.3d 909, 919 (7th Cir. 2010) (Judge Richard Posner explaining that clearly meritorious affirmative defenses properly form the basis of a motion on the pleadings under Rule 12(c), which is a motion for dismissal on the merits); ***Baker v. Potter***, 175 F.App'x 759, 762 (7th Cir. 2006) (affirming district court's entry of final judgment on the merits on review of a motion for judgment on the pleadings under Rule 12(c)).

Finally, Federated filed its Motion Under Indiana's Anti-SLAPP Statute, to be treated as a Motion for Summary Judgment. However, the entry of final judgment in Federated's favor on Counts VII-XII and XVI-XVII terminates Federated's participation in this cause of action.  Therefore, this motion is **DENIED AS MOOT.**

———————————

For the foregoing reasons,  the Motion for Judgment on the Pleadings on Claims Arising Before February 9, 2007 [DE 44] is **GRANTED,** the Motion for Judgment on the Pleadings on Counts XVI-XVII (Emotional Distress Claims) [DE 46] is **GRANTED,** the Motion for Judgment on the Pleadings on Counts VII-IX (Defamation/False Light Claims Relating to the Article) [DE 48] is **GRANTED,** the Motion for Judgment on the Pleadings on All Claims Relating to Third-Party Content [DE 50] is **GRANTED,** and the Motion Under

34

Indiana's Anti-SLAPP Statute (Treated as a Motion for Summary Judgment) [DE 52] is **DENIED AS MOOT.**

ENTERED this 24th day of March, 2010.


                                    s/ ANDREW P. RODOVICH
                                       United States Magistrate Judge